# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISON

## CIVIL ACTION NO.: _____

| | | |
|---|---|---|
| CHARLOTTE PHIFER, as Guardian for JAMARIOUS RASHAD PHIFER, SR. <br><br> Plaintiff, <br><br> v. <br><br> MECKLENBURG COUNTY; CRAIG M. LOUALLEN, in his individual capacity; CHRISTY NOLEN, in her individual capacity; MECKLENBURG COUNTY SHERIFF GARRY McFADDEN, in both his individual capacity and his official capacity, LIBERTY MUTUAL INSURANCE COMPANY, and PLATTE RIVER INSURANCE COMPANY, as Surety for Sheriff McFadden, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **COMPLAINT** <br> **(Jury Trial Demanded)** |

Charlotte Phifer, through her undersigned counsel of record, brings this civil rights action pursuant to 42 U.S.C. § 1983 as guardian on behalf of her incapacitated husband, Jamarious Phifer (hereinafter "Plaintiff"), against Defendants Mecklenburg County, Craig Louallen, Christy Nolen, and Sheriff Garry McFadden, with Liberty Mutual Insurance Company and Platte River Insurance Company as Sureties for Sheriff McFadden.

## PARTIES

1. Charlotte Phifer (hereinafter "Charlotte") is the wife of Jamarious Phifer (hereinafter "Jamarious" or "Plaintiff"), who was found to be an incompetent adult, and is his duly appointed guardian pursuant to a Mecklenburg County court order dated September 1, 2023, Case No. 23-E-3392.

2. Charlotte and Jamarious are citizens of North Carolina and reside in Mecklenburg County.

3. Defendant Mecklenburg County is a governmental agency located in Mecklenburg County, North Carolina.

4. At all relevant times to this case, Defendant Sheriff Garry McFadden (hereinafter "Defendant McFadden" or "Defendant Sheriff McFadden" or "Sheriff McFadden" or "Sheriff") was a resident of Mecklenburg County, North Carolina, and was an elected as Sheriff of Mecklenburg County, pursuant to Article VII, Section II of the North Carolina Constitution and N.C. Gen. Stat. § 162-1, and was:

   a. in charge of overseeing and managing the operations of the Mecklenburg County Detention Center (hereinafter "MCDC" or "the Jail") on behalf of Defendant Mecklenburg County;

   b. in control of the jail with final decision-making authority over law enforcement policies and the officers and agents hired by the Jail, as well as any person who worked for the Mecklenburg County Sheriff's Department;

   c. acting within the course and scope of his official duties as Sheriff and was acting under color of state law;

d. responsible for the operation of the jail, including:

    i. the care and custody of all persons detained by the Jail, including Plaintiff; and

    ii. the administration, management, and supervision of the healthcare delivery system for its detainees;

e. the keeper of the Jail pursuant to N.C. Gen. State. § 162-55, and appointed or other keepers of the Jail, or delegated duties to other persons in carrying out his appointed role.

5. Upon information and belief, Defendant Liberty Mutual Insurance Company ("Defendant Liberty Mutual") is a corporation organized and existing under the laws of the State of Massachusetts and is the surety bond holder in contract with the Mecklenburg County Sheriff's Office pursuant to N.C. Gen. Stat. § 58-76-5 and N.C. Gen. Stat. § 162-8. Defendant Liberty Mutual, as the surety bond holder for Sheriff McFadden at all times relevant to this Complaint, is liable for the acts of Sheriff McFadden and his agents under virtue of his office resulting in serious harm pursuant to N.C. Gen. Stat. § 58-76-5.

6. Upon information and belief, Defendant Mecklenburg County has further waived sovereign immunity of the Mecklenburg County Sheriff's Department through the purchase of liability insurance pursuant to N.C. Gen. Stat. § 153A-435.

7. In accordance with N.C. Gen. Stat. § 58-76-1, et seq., Sheriff Garry McFadden also secured a surety bond from Defendant Platte River Insurance Company at the start of his term.

8. Upon information and belief, Defendant Platte River Insurance Company ("Defendant Platte River") is a corporation organized and existing under the laws of the State of

Nebraska and is the surety bond holder in contract with the Mecklenburg County Sheriff's Office pursuant to N.C. Gen. Stat. § 58-76-5 and N.C. Gen. Stat. § 162-8. Defendant Platte River, as the surety bond holder for Sheriff McFadden at all times relevant to this Complaint, is liable for the acts of Sheriff McFadden and his agents under virtue or color of office resulting in serious harm pursuant to N.C. Gen. Stat. § 58-76-5.

9.  By obtaining coverage via surety bond, liability insurance, or participation in a government risk pool, Defendant McFadden waived governmental and sovereign immunity on his own behalf and on behalf of his agents acting in their official capacities in carrying out his duties in operating the Jail.

10. Defendant McFadden's current term ends in December of 2026.

11. Defendant Louallen and Defendant Nolen are employees of Defendant Mecklenburg County and were detention officers at the Mecklenburg County Detention Center (hereinafter "MCDC") at 700 E 4th St, Charlotte, North Carolina 28202. They are each being sued in their individual capacities.

12. Upon information and belief, the Defendants, with exception to the sureties, are all citizens of North Carolina and reside in Mecklenburg County, North Carolina at all times relevant to this Complaint. The sureties provide bond coverage for acts and omission occurring by such Defendants within Mecklenburg County, North Carolina.

13. At all times relevant to this complaint, the individual Defendants acted under color of state law, in the course and scope of their employment with Defendant Mecklenburg County, with respect to the allegations herein.

### **WAIVER OF IMMUNITY**

14. The allegations in the preceding paragraphs are hereby incorporated herein by reference.

15. At all relevant times, to the extent that any or all Defendants claim they are a municipal or government or county-owned, operated, or funded entity or an employee or agent of such entity, all such Defendants waived any potential governmental immunity or sovereign immunity defense for any of the acts or omissions alleged in this Complaint.

16. Defendant Sheriff McFadden is specifically sued in both his individual capacity and in his official capacity.

17. Upon information and belief, because Defendant Liberty Mutual furnished a bond or bonds pursuant to N.C. Gen. Stat. § 162-8 and an additional bond covering Sheriff McFadden, Liberty Mutual is named as a Defendant to this action, pursuant to N.C. Gen. Stat. § 58-72-1, et seq.

18. Upon information and belief, because Defendant Platte River furnished a bond or bonds pursuant to N.C. Gen. Stat. § 162-8 and an additional bond covering Defendant Sheriff McFadden, Platte River is named as a Defendant to this action, pursuant to N.C. Gen. Stat. § 58-72-1, et seq.

19. Upon information and belief, the Office of the Sheriff, or Mecklenburg County on behalf of the Sheriff, purchased a liability insurance policy or policies with Safety Specialty Insurance Company that provides coverage for claims made by Plaintiff.

20. Upon information and belief, Defendant Sheriff McFadden and Defendant Mecklenburg County have an Excess Liability insurance policy with Safety National Insurance Company with a limit of $3,000,000.00 per occurrence, providing coverage for Plaintiff's claims in excess of the self-insured retention and law enforcement liability policy.

21. Upon information and belief, Defendant McFadden and Defendant Mecklenburg County have a Law Enforcement Liability insurance policy with Safety Specialty Insurance

Company for up to $2,000,000.00 per occurrence, providing coverage for Plaintiff's claims against Defendants.

22. Upon information and belief, Defendant McFadden and Defendant Mecklenburg County are self-insured up to $1,500,000.00.

23. At all relevant times, it is specifically alleged that Defendant McFadden, and any and all of his agents, employees, officers, jailers, deputies, or others who worked at the Jail, waived any potential governmental immunity or sovereign immunity defense that could have been raised to the Complaint by virtue of bonds and liability insurance policies to the extent of such bonds or policies.

24. At all relevant times, Defendant McFadden, and any and all of his agents, employees, officers, jailers, deputies, or others who worked at the Jail, waived any potential qualified immunity defense.

25. To the extent that Defendants have not expressly waived any qualified immunity defense, no such defense can apply given the overt negligent and grossly negligent violations of the constitutional rights of Jamarious Phifer while he was in the custody and control of Defendant McFadden at MCDC.

26. To the extent that Defendant McFadden makes any claim that he is not responsible for the actions of any non-law enforcement third party because it and its employees were hired under a contract and not as direct employees, this has been waived. Plaintiff specifically pleads a non-delegable duty owed to a detainee to provide for serious medical needs while under the custody and control of the Jail.

27. There is no question that employees and agents of Defendant McFadden at the Jail had to provide a detainee with care for his serious medical needs including medication,

appropriate medical treatment, and timely observation.

28. Plaintiff specifically pleads the non-delegable duty owed to a detainee by a Sheriff, or his employee or all keepers of the Jail as a waiver of such a claim or defense and that Defendant McFadden is vicariously liable for their actions and that they are acting under color of state law like the rest of Defendant McFadden's employees.

29. In the alternative, at all relevant times, Defendant McFadden, and any and all agents, employees, officers, jailers, deputies, or others who worked for him at the Jail, waived any potential governmental immunity or sovereign immunity defense to the extent that they had any additional bonds or insurance or participated in any local governmental risk pool pursuant to N.C. Gen. Stat. §§ 153A-435 and 58-23 that might cover any acts or omissions alleged in this Complaint.

## JURISDICTION AND VENUE

30. This Court has jurisdiction over the claims against Defendants pursuant to 28 U.S.C. § 1331 because those claims arise under federal law, 42 U.S.C. § 1983.

31. Venue is proper in the Western District of North Carolina, Charlotte Division, pursuant to 28 U.S.C. § 1391 (b)(1) & (2), as all parties reside in this District and the acts or omissions complained of occurred within this District.

## FACTUAL ALLEGATIONS

32. On May 3, 2023, 34-year-old Jamarious Phifer was arrested for possession of MDMA and was booked into the Mecklenburg County Jail just before 5:00 PM.

33. Upon booking, Defendant Nolen performed intake and took Plaintiff's property.

34. This property included prescription medications taken daily by Plaintiff since at least 2019 to control his hypertension, as well as his seizure disorder.

35. Documents from the arresting officers show that prescription pill bottles with Plaintiff's name on them containing these medications were found in the vehicle at the time of the arrest.

36. Upon information and belief, Plaintiff notified Defendant Nolen that he had hypertension and a seizure disorder and required this medication to control it.

37. Despite this, Defendant Nolen did not indicate that those specific medications were among Plaintiff's property.

38. Further, Defendant Nolen indicated Plaintiff had no physical problems. However, withdrawal was noted on the intake documentation.

39. Sometime between 7:00 PM and 8:00 PM on May 3, 2023, Jamarious called Charlotte to notify her of his arrest and asked her to call a bail bondsman.

40. Charlotte called MCDC immediately after she hung up with Jamarious to provide additional information on his serious chronic health issues to officers at MCDC.

41. Charlotte told the officer on the phone that Jamarious had hypertension requiring two (2) medications, amlodipine and lisinopril, which were in his possession at the time of the arrest and had been inventoried and taken into the property room.

42. Charlotte further relayed that Jamarious had a severe seizure disorder that required medication to control withdrawal-related grand mal seizures.

43. Charlotte advised officers that either someone needed to go to property to get the hypertension medications and bring them out to be administered to Jamarious, or somebody at the Jail needed to write him a new prescription for the hypertension medications and get him his medication before he began experiencing a hypertensive crisis.

44. Concerned for Jamarious' wellbeing, Charlotte made multiple calls to MCDC to speak with various staff and alert them of his serious medical needs.

45. Charlotte advised multiple people at the Jail that, in addition to diligent administration of medication for his hypertension, Jamarious would need to be carefully watched for withdrawal-related seizure activity. She specifically warned them that his grand mal seizures would make him appear to be sleeping and he needed to be closely watched to make sure he was breathing.

46. Charlotte further advised everyone she spoke with at the jail that Jamarious needed his medication right away, and needed to receive it regularly, in order to prevent serious illness.

47. MCDC medical records show that Plaintiff was evaluated in medical by Ayana Puryear at around 11:00 PM on May 3, 2023 for alcohol withdrawal pursuant to the Clinical Institute Withdrawal Assessment (CIWA) protocol.

48. Jamarious was noted at that time to have a blood pressure of 176/110 and a pulse of 84 beats per minute (BPM), indicating a hypertensive crisis requiring immediate medical attention.

49. Despite having the information that Jamarious had severe hypertension which required two (2) medications to control, neither Defendant Nolen nor anyone at MCDC provided Jamarious any of the medications confiscated by them upon booking, nor did Defendant Nolen or anyone else at the Jail notify medical of the medications, such that new prescriptions were never ordered for him so he could resume his hypertension therapy.

50. Instead, Jamarious was simply ordered to have a CIWA assessment where he would be observed three (3) times per day for five (5) days, and was prescribed an anti-anxiety

injection to manage withdrawal symptoms.

51. It is unclear from the records whether a dose of the injectable medication was administered to Jamarious at the time of this initial assessment.

52. However, the records make clear that Jamarious was never again seen in medical and did not receive either the ordered CIWA assessments three times per day, or any of ordered injections, including during the next shift.

53. Jamarious also never appears to have received his home hypertension medications, was not provided any hypertension medications from the jail, and was not provided any medication for his seizure disorder.

54. Jamarious called Charlotte again on the morning of May 4, 2023 and told her he still had not had any medication and was starting to have seizures.

55. Jamarious told Charlotte he had told officers of his seizures and that he felt unwell and needed his medication but that nobody brought him any medication.

56. Charlotte called MCDC again to ask someone to check on Jamarious, as he was very unwell and had reported to her that despite his seizures, MCDC had not provided him with any medication and she was concerned about his serious medical needs not being met.

57. MCDC medical records indicate that an officer in the bond hearing that morning had reported Jamarious had a "seizure like event" while in court.

58. No MCDC officer, nor any person from the Mecklenburg County bond court, obtained emergency medical treatment for Jamarious after this seizure. He was simply returned to his unit at the jail.

59. An unknown person from the Jail notified Eva Squibb in MCDC medical of the seizure-

like activity during court that morning and she made a note of it in the records.

60. Jail records show Defendant Louallen was on shift to perform watch tours, making security rounds, including to the unit where Jamarious was being housed during the time of this incident.

61. Jail records show that at 2:15 PM, Defendant Louallen was in Unit 2540 doing checks.

62. Jail records then show that, ten minutes later, at 2:25 PM, Defendant Louallen scanned that he was in Unit 2570, Plaintiff's unit.

63. Defendant Louallen noted at that time that he had discovered Jamarious lying motionless on his back and called medical.

64. It does not appear from the records that Jamarious had been checked by Defendant Louallen before that time.

65. Incident reports show that the emergency call actually went out at 2:24 PM, before Defendant Louallen documented that he was in the unit and had found Jamarious unresponsive.

66. The MCDC medical staff responded to the emergency call in Jamarious' unit at 2:28 PM.

67. Defendant Louallen did not perform life-saving measures on Jamarious.

68. When medical arrived, Jamarious was noted to be cyanotic and blue, and CPR and defibrillation were administered.

69. After 30 minutes, Jamarious was resuscitated and an ambulance was finally called to transport him to the hospital.

70. The medical records from the hospital show Defendant McFadden falsely reported to the emergency department providers that Jamarious had ingested something and he further told them this had been confirmed using an x-ray scan at the jail.

71. It is believed Defendant McFadden told the hospital this in order to cover for the fact that Jamarious had not been provided his hypertension medication despite knowledge he was in desperate need of it, had not been taken for emergency outside medical care by anyone at Mecklenburg County when he had a seizure in court, and had been left unattended for hours afterward and endured a grand mal seizure to the point he was in cardiac arrest.

72. This false report wasted precious time during Jamarious' emergency medical care as the staff imaged his abdomen and took steps to treat a possible drug ingestion which did not exist.

73. The hospital determined Jamarious had not ingested anything, and he did not test positive for any such substance.

74. The hospital records show staff was told Jamarious had not received his morning injectable dose of benzodiazepine ordered after his initial CIWA assessment.

75. The Jail medical records show that the first time any provider attempted to provide Jamarious with his ordered injection, he had already been transported and admitted to the hospital.

76. At no time did anyone administer Jamarious' prescribed hypertension medications to him.

77. At no time did any officer of the Jail or the Court obtain emergency care for Jamarious when he suffered a seizure during his hearing.

78. It was not until the next day, at 7:30 AM on May 5, 2023, that someone from MCDC finally called Charlotte to tell her about Jamarious' cardiac arrest and hospitalization.

79. Jamarious suffered a severe anoxic brain injury as the result of his seizure and cardiac arrest, has been bedridden, and has required around-the-clock skilled nursing care in a facility since his injury.

80. When Charlotte received Jamarious' property back from Mecklenburg County, the pills previously noted in the arrest records to be in prescription pill bottles bearing labels with his name had been dumped out into a plastic bag and the pill bottles previously documented in his arrest records were inexplicably missing.

81. Plaintiff asserts this concealment was yet another attempt to cover up the fact that despite Defendant Nolen, Defendant Louallen, Defendant McFadden, and other employees of Mecklenburg County having ample information about and opportunity to observe that these medications were necessary

**FOR A FIRST CAUSE OF ACTION**
**Deliberate Indifference to Serious Medical Needs**
**in Violation of the Fourteenth Amendment**
(Defendant McFadden, Defendant Nolen, and Defendant Louallen)

82. Defendant McFadden, Defendant Nolen, and Defendant Louallen had a duty to provide care for the serious needs of detainees in custody at MCDC, including Plaintiff.

83. Defendant McFadden, in managing and administering the Jail, had a nondelegable duty to provide for serious medical needs of detainees at MCDC and is not absolved from liability by the decision to contract with a third-party provider to staff the Jail to serve as its agents in carrying out the Jail's duty to provide correctional medical care within the Jail's security framework to detainees in MCDC custody.

84. Defendant McFadden, Defendant Nolen, and Defendant Louallen had specific knowledge, information, and an opportunity to observe Plaintiff's serious medical needs that required medication they had in their possession and hospitalization and failed to provide for said serious medical needs.

85. At intake, Defendant Nolen had knowledge the Jail was depriving Jamarious of

medication for serious medical needs which were documented to exist on Jamarious' person at the time of his arrest, but his home meds taken into custody of the Jail property room were neither acknowledged in booking documentation nor brought to medical's attention by Defendant Nolen.

86. Defendant Nolen further had knowledge from speaking with Charlotte about the serious medical needs of Jamarious, his specific disorders, his symptoms, and his need for medication.

87. Defendant Nolen further had knowledge that Jamarious' condition could be life-threatening and that he needed to be watched very closely.

88. Defendant Louallen had knowledge of Jamarious' serious medical conditions because he was housed in the detoxification dormitory and information about his hypertension, seizure disorder and his need for medication had been shared with the Jail and appeared in his medical records.

89. Defendant Louallen had knowledge Jamarious had suffered "seizure-like activity" in court that morning.

90. Jamarious being housed in the detoxification dormitory provided all MCDC staff, including Defendant Louallen who was supposed to be on watch that shift, that he had serious medical needs and needed close supervision.

91. Defendant Louallen knew specifically he was supposed to be checking on Jamarious and watching his condition.

92. Defendant Louallen was not making timely safety checks in the detoxification unit despite his knowledge that Jamarious was in withdrawal and was at risk from his serious medical needs not being met.

93. Had Defendant Louallen made timely checks on Jamarious, whom was known to have serious medical needs, his condition would have been discovered before he went into cardiac arrest. Alternatively, had Jamarious been discovered sooner, he may not have suffered such injuries.

94. Defendant Louallen further failed to provide emergency lifesaving resuscitation measures for a period of time after discovering Jamarious unresponsive and not breathing.

95. All three (3) of these Defendants were aware or should have been aware that there were orders for Jamarious to receive CIWA evaluation and his injectable medication three (3) times per day.

96. Because Defendant Garry McFadden operates MCDC so severely understaffed, detention officers, including Defendant Nolen and Louallen, are unable to provide medical providers with timely access to detainees which requires security officer supervision. Thus, these Defendant McFadden failed to operate the Jail in a manner which would allow timely medical access to detainees so medical staff could provide Jamarious with the ordered timely assessments which would have alerted medical to his continued critical hypertension, seizure activity, and any breathing difficulty.

97. Defendant Nolen failed to keep a proper record of Jamarious' property in the form of medication and failed to keep proper documentation of calls from Charlotte reporting his serious medical needs and medication requirements. Alternatively, if such documentation was created, it was improperly altered or removed.

98. Defendant Louallen failed to keep a proper record of documentation of Jamarious' seizure activity in court the morning of his cardiac arrest, of calls from Charlotte reporting his serious medical needs and medication requirements, and of his security watch tours and

watch over detainees in the detoxification unit. Alternatively, if such documentation was created, it was improperly altered or removed.

99. Defendant McFadden improperly reported false information to the hospital treating Jamarious after his cardiac arrest in order to conceal the acts or omission complained of by Plaintiff, which led to delay in treatment and unnecessary medical procedures which caused further pain and suffering to Jamarious.

100. The foregoing knowledge, acts, and omissions by each Defendant McFadden, Defendant Nolen, and Defendant Louallen amounted to a complete denial of care for Jamarious' serious medical needs in the following particulars, to wit:

a. Failing to provide Jamarious with known prescribed home medication for his serious hypertension;

b. Failing to provide information known about Jamarious' serious medical needs and medication removed from his possession to medical for an initial assessment upon booking;

c. Failing to monitor Jamarious for seizure activity despite knowing he has grand mal seizures and was in alcohol withdrawal;

d. Failing to provide access for medical to provide Jamarious with his ordered CIWA assessments and medication regimen;

e. Failing to send Jamarious for immediate medical attention upon gaining knowledge he had been witnessed having a "seizure like" episode in court;

f. Failing to do timely security checks in the detoxification dormitory;

g. Failing to keep proper documentation of the serious medical needs or Jamarious Phifer; and

h. Failing to accurately and truthfully report known information about the medical crisis Jamarious was in to his providers at the hospital.

101. The conduct and actions of these Defendants, acting under color or state law, in failing to attend to and provide Jamarious with appropriate health care while he was in their custody and control at MCDC, and was done intentionally, willfully, maliciously, and with deliberate indifference to and/or reckless disregard for his basic human needs, causing severe injury.

102. This failure to provide for Jamarious' serious medical needs constitutes a violation of his substantive due process rights guaranteed under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

103. These Defendants are liable to Plaintiff based upon their conduct.

**FOR A SECOND CAUSE OF ACTION**
**Deliberate Indifference to Serious Medical Needs**
**in Violation of the Fourteenth Amendment and**
*Monell v. Department of Social Services of City of New York*
(Defendant Mecklenburg County)

104. Plaintiff repeats and realleges all factual allegations as if fully restated herein.

105. Defendant Mecklenburg County has an affirmative duty to appropriately staff its facility such that it can conduct safety checks in accordance with state requirements.

106. Defendant Mecklenburg County has an affirmative duty, which is nondelegable, to provide appropriate medical care for serious medical needs to individuals in their custody and care, including Jamarious.

107. MCDC reports its suggested capacity to be 1,900 detainees.

108. A 2022 report from the North Carolina Department of Public Safety (NCDPS) found MCDC was overcrowded.

109. NCDPS suggested a reduction of the inmate capacity at MCDC to under 1,000 based on its staffing, but MCDC declined to comply with this request.

110. As of August of 2024, MCDC had a population count of 1,322 which required "overflow status" for numerous detainees, requiring them to sleep on a floor mattress.

111. Upon information and belief, this adjustment requested by NCDPS was never made and staffing was not increased as of the time of this incident with Jamarious.

112. Beginning in 2008, Defendant Mecklenburg County contracted with Wellpath to provide healthcare services to detainees at the MCDC facility.

113. Defendant Mecklenburg County, for a period of years, has engaged in a pattern and practice of deliberate indifference to:

   a. their gross understaffing at MCDC which prevented medical providers from having timely access to provide care to detainees;

   b. the timeliness and documentation of their security checks during watch tours; and

   c. policies which hampered or frustrated decisions by medical staff to seek outside care for detainees when serious medical needs arose.

114. In addition to the serious injury to Jamarious, between 2019 and 2024, there were 18 deaths at the facility, making MCDC an extreme outlier on the high side in terms of NC jail deaths.

115. Reports of failure to conduct timely safety checks by inspectors have been common at MCDC, and in 2022, hundreds of missing safety checks were identified in reviewing the logs.

116. Subsequent inspections throughout the next year routinely identified a continuing pattern of untimely or missed safety checks.

117. The conduct and actions of Defendant Mecklenburg County, acting under color of state law, in failing to properly staff its jail in order for its detention officers to properly attend to and provide medical care access to Jamarious was done willfully, maliciously, and with deliberate indifference to and/or reckless disregard for his basic human needs, causing severe injury.

118. This failure to provide for Jamarious' serious medical needs constitutes a violation of his substantive due process rights guaranteed under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

119. Defendant Mecklenburg County is liable to Plaintiff based upon these improper practices.

## JURY DEMAND

**WHEREFORE**, Plaintiff demands a trial by jury and respectfully requests that this Court award the following damages, jointly and severally against Defendants, as provided by North Carolina law and the United States Constitution, including but not limited to the following:

120. Compensatory, actual, and consequential damages to Plaintiff, including:

a.  i. pain and suffering, past and future;

b.  ii. mental anguish, past and future;

c.  iii. loss of enjoyment of life;

iv. loss of past and future support and services with interest;

v. loss of earnings and/or earning capacity; and

v. compensation for medical bills as a result of psychological and physical injury, as a result of the incapacitation of Jamarious Phifer;

121. Costs of this action and attorneys' fees to Plaintiffs for the civil rights causes

of action under 42 U.S.C. § 1988;

122.	Punitive damages against any Defendant as allowed;

123.	Loss to Charlotte of familial relationship with Jamarious Phifer, love, companionship, comfort, support, society, care, and the mental pain and suffering from the past date of injury through the future, and,

124.	Such other and further relief as this Court may deem appropriate.

**THOMPSON LAW FIRM**

*s/ Brian E. Thompson*
Brian E. Thompson
301 N. Main Street, Suite 2449
Winston-Salem, NC 27101
Phone: (336) 290-1856
Email: brian@thompsonpersonalinjury.com

**STROM LAW FIRM, LLC**
Bakari T. Sellers
Amy E. Willbanks
6923 N. Trenholm Road, Suite 200
Columbia, South Carolina 29206
Phone: (803) 252-4800
Email: bsellers@stromlaw.com
awillbanks@stromlaw.com

*To be admitted pro hac vice*

***Attorneys for Plaintiff***

April 30, 2026
Winston-Salem, North Carolina